**In re Anonymous No. 158 D.B. 2000**

Disciplinary Board Docket no. 158 D.B. 2000.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

WATKINS, *Member,* January 4, 2002—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disci-

plinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 14, 2000, a petition for discipline was filed by petitioner, Office of Disciplinary Counsel, against [ ], respondent in these proceedings. The petition charged respondent with violations of Pennsylvania Rules of Professional Conduct 1.3, 1.15(a), 1.15(b), and 8.4(c). Respondent filed an answer on January 22, 2001, and admitted all allegations raised in the petition, including the admission that he violated those specific Rules of Professional Conduct.

A disciplinary hearing was held on April 5, 2001, before Hearing Committee [ ] comprised of Chair [ ], Esquire, Member [ ], Esquire, and Alternate Member [ ], Esquire. Following briefing by the parties, the Hearing Committee filed a report on July 24, 2001, in which it recommended that respondent be suspended for a period of three months.

No briefs on exceptions were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting of September 11, 2001.

## II. FINDINGS OF FACT

The board makes the following findings of fact based upon petitioner's exhibits and the testimonial evidence of respondent:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania

15219, is invested, under Rules 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of that rule.

(2) Respondent was born in 1927 and was admitted to the practice of law in the Commonwealth of Pennsylvania in 1957. Respondent has been a sole practitioner with a focus in real estate work. (N.T. 11.)

(3) Over the years as an attorney, respondent was a former board of directors' member of the [　] Bar Association, an assistant city solicitor for the City of [　], and is presently an assistant solicitor with [　] County and the [　] program. (N.T. 12.)

(4) During the years of 1995 and 1996, respondent was an approved attorney with the [A] Insurance Company which permitted him to conduct business with [A] Attorneys.

## [B] SETTLEMENT

(5) In 1995, respondent represented [　] and [　] [B] in a closing involving property at [　]. On October 12, 1995, respondent acted as the settlement agent for the [B]/[C] closing.

(6) As a result of the closing, respondent received from the [B] a sum of $1,178.50, $379 of which represented title insurance premiums and should have been forwarded to [A] after the closing. The proceeds from the closing were deposited into a bank account used for general business purposes, which also contained personal funds re-

sulting in a commingling of funds. Respondent did not forward the check for $379 to [A]. (N.T. 17-18.)

(7) Respondent failed to promptly disburse funds he received at the closing. Respondent converted title insurance premiums together with the fee he would have otherwise earned had he paid the title insurance premium to his own use.

## [D] SETTLEMENT

(8) Respondent represented [    ] and [    ] [D] in December of 1995 in reference to a refinancing of property located at [    ].

(9) When the real estate closing took place, a check in the amount of $189,300 was deposited by respondent on behalf of the [D] into an account which was used by respondent for general business purposes and which contained his personal funds, constituting a commingling of funds. Of this amount, $812.50 represented title insurance premiums and should have been forwarded to [A] after the closing.

(10) Respondent failed to properly disburse funds he received at the closing, as a result of which he did not earn a legal fee for obtaining the title insurance. Respondent converted title insurance premiums together with the fee he would have otherwise earned had he paid the title insurance premium to his own use.

## [E] SETTLEMENT

(11) Respondent, in the summer of 1996, represented [    ] and [    ] [E] in relation to a purchase of property at

[   ]. On July 24, 1996, the closing was held, as a result of which a check from the [E] in the amount of $7,004.76 was issued representing the cash due at settlement.

(12) The amount of $575 of that sum was collected by respondent for title insurance.

(13) Respondent deposited proceeds from the [E] closing into an account used for general purposes which also contained personal funds, constituting a commingling of funds.

(14) Respondent failed to remit payment to [A] in the amount of $159.75 after the closing.

(15) Respondent used a substantial portion of the [E] funds by converting the title insurance premiums together with the fees he would have otherwise earned had he paid the title insurance premiums to his own use.

(16) As a result of these three real estate transactions, respondent owed [A] approximately $1,350. (N.T. 18.)

(17) [A] filed a lawsuit against respondent in October of 1997. Respondent allowed default judgment to be entered against him in the amount of $3,250.

(18) During 1995 and 1996, respondent carried malpractice insurance. (N.T. 19-20.)

(19) As an agent of [A], respondent was bonded, which provided separate insurance to cover any mistakes. (N.T. 20.)

(20) All three closings were properly closed otherwise. (N.T. 21.)

(21) The [B] never complained that they were not represented properly, and they received a proper binder at the closing. (N.T. 14-15.)

(22) The [D] never complained that their closing was not conducted properly or in a professional manner or that they did not receive a title policy. (N.T. 15-16.)

(23) The [E] never complained that they were not properly represented or that there was not proper title insurance on the property. (N.T. 16-17.)

(24) On November 19, 1999, respondent satisfied the judgment entered against him by [A]. (N.T. 19.)

(25) Respondent no longer practices real estate and he is currently winding down his private practice. (N.T. 29.)

(26) With respect to the three transactions with [A] Attorneys, respondent knew that what he was doing was wrong and it was an intentional decision on his part to not pay what he was otherwise obligated to pay. (N.T. 33.)

## MITIGATING CIRCUMSTANCES

(27) The respondent has never been the subject of a disciplinary action other than the current matter. (N.T. 27.)

(28) The respondent made restitution in 1999. (N.T. 19.)

(29) The respondent testified that in 1995 and 1996 his diabetic condition which he has had for 15 to 20 years was no longer under control and he was now becoming insulin dependent. The overall effect on his health was that he was becoming lethargic, depressed, forgetful and it affected his vision. (N.T. 23-25.)

(30) Respondent did not present any expert testimony demonstrating a causal connection between the respondent's diabetic condition and the underlying misconduct.

(31) Respondent's wife had two hip operations between 1995 and 1997, which caused him to take care of her and neglect his practice, creating a lack of cash flow. (N.T. 26-27.)

(32) Respondent testified that he realized what he did was wrong. Respondent did not turn over the title insurance premiums because he personally needed the money. (N.T. 29, 40.)

(33) In 1999, a civil action was initiated against respondent by [F] Insurance Company, his malpractice carrier. The basis of the lawsuit was the failure of respondent to pay the $2,500 deductible. Judgment has been entered and respondent is making payments. (N.T. 37-38, 45.)

(34) In 1999, [G] Company also brought a suit against respondent and payments are currently being made on that judgment. (N.T. 38-39, 45.)

(35) Respondent has a fine reputation in general in [   ] County. (N.T. 51.)

(36) Respondent has been practicing law for 44 years.

(37) Respondent presented favorable character witnesses.

(38) Respondent had financial difficulties during the years in question.

## III. CONCLUSIONS OF LAW

As a result of his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) RPC 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(2) RPC 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(3) RPC 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person.

(4) RPC 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

This is the case of a respondent who is 74 years old and has been practicing law since 1957 as a sole practitioner handling civil cases and real estate work. Respondent has no prior discipline and enjoys a very good reputation in [   ] County. The evidence of record demonstrates that during the years 1995 and 1996, respondent was the approved attorney for [A] Insurance Co. In that capacity, between the fall of 1995 and the summer of 1996, respondent handled three residential real estate transactions wherein he collected title insurance premiums and commissions totaling approximately $3,700, which funds he commingled with his own in his general account and subsequently converted to his own use and purposes without sending in the insurance premiums or additional documentation necessary to [A] to issue the owner and lender title insurance policies. Respondent did properly handle all other aspects of those transactions. None of the three clients made complaints against respondent and respondent made [A] whole by paying the judgment against him.

Respondent admitted that his conduct was in violation of the Rules of Professional Conduct, and he candidly admitted at the hearing that he intentionally failed to send [A] the premiums due them, even though he knew it was wrong, "because he needed the money." (N.T. 33, 40.) Respondent testified to his personal circumstances at the time of the misconduct. Respondent suffers from diabetes and his health was not good. His wife had two hip operations between 1995 and 1997, she was bedridden, and he had to care for her and take her to therapy. This caused him to be out of the office 50-75 percent of the time, a substantial amount for a sole practitioner, which caused cash flow problems. While these circumstances might well explain respondent's need for money, they do not in any way justify or excuse his misappropriation of client and third-party funds. An attorney's personal financial difficulties in no way mitigates the seriousness of his misconduct involving client funds. *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982).

Misappropriation of client or third party funds is a serious offense. *Office of Disciplinary Counsel v. Monsour,* 549 Pa. 482, 701 A.2d 556 (1997). However, every case is entitled to be evaluated individually with attention given to all aggravating and mitigating circumstances. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). The board believes that respondent's full cooperation with the Office of Disciplinary Counsel, his 44 years of unblemished practice of law in the Commonwealth, and the high regard in which he is held by fellow lawyers deserve consideration.

Case law suggests that some length of suspension is appropriate. Clearly less than a suspension would not adequately address the intentional and dishonest nature of respondent's acts. See *In re Anonymous No. 6 D.B. 86,* 2 D.&C.4th 67 (1987) (attorney received a three-month suspension for having removed $14,000 from his firm's escrow account); *Office of Disciplinary Counsel v. Kochel,* 515 Pa. 449, 529 A.2d 1075 (1987) (attorney received a three-month suspension after he misappropriated $11,000 from client escrow accounts on 23 occasions); *In re Anonymous No. 49 D.B. 1998,* No. 668 Disciplinary Docket no. 3 (Pa. May 8, 2001) (attorney received a one year and one day suspension after he converted six checks belonging to his law firm totaling $31,500); *In re Anonymous No. 50 D.B. 87,* 3 D.&C.4th 627 (1989) (two year suspension for a lawyer who converted a check in the amount of $15,000 but who did not accept responsibility and instead argued he had no duty to keep the funds segregated).

The board is cognizant that respondent plans to wind down his practice, does not do real estate work anymore and has approximately 10-15 active clients. A suspension of three months, as recommended by the hearing committee, appropriately addresses respondent's misconduct while accounting for the unique facts of this matter.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [    ], be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of three months.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Cunningham dissented and would recommend a one-year suspension.

Board Members Halpern and Stewart did not participate in the September 11, 2001 adjudication.

## ORDER

Per curiam:

And now, March 11, 2002, upon consideration of the report and recommendations of the Disciplinary Board dated January 4, 2002, it is hereby ordered that [respondent] be and he is suspended from the Bar of this Commonwealth for a period of three months and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.